**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**JUDGE RAKOFF**

RICHARD HERSHEY, on behalf of himself and all others similarly situated,

               Plaintiff,

- against -

ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER COMPANY, ETC MARKETING, LTD., and HOUSTON PIPELINE COMPANY,

               Defendants.

Docket No __ CIV **7811**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



RECEIVED
SEP 0 4 2007
U.S.D.C. S.D N.Y.
CASHIERS

Plaintiff Richard Hershey ("Plaintiff"), by his undersigned attorneys, brings this action against Defendants Energy Transfer Partners, L.P., Energy Transfer Company, ETC Marketing, Ltd., and Houston Pipeline Company (collectively, the "Defendants"), pursuant to the Commodity Exchange Act, as amended, 7 U.S.C. § 1, *et seq.* (the "CEA"), on behalf of himself and all others who purchased and/or sold natural gas futures and options contracts on the New York Mercantile Exchange ("NYMEX") between December 29, 2003 and December 31, 2005 (the "Class Period"). Plaintiff's allegations as to himself and his own actions are based upon his personal knowledge and to information obtained during the course of his attorneys' investigation and upon information and belief as to all other matters, as follows:

## SUMMARY OF ALLEGATIONS

1.    This action arises from Defendants' intentional and unlawful manipulation of the prices of NYMEX natural gas futures contracts during the Class Period in violation of the CEA.

2.    As is more fully alleged below, during the Class Period, Defendants manipulated natural gas prices by selling massive amounts of fixed price natural gas for prompt month

delivery at artificially low, non-competitive prices at major natural gas trading hubs, including the Houston Ship Channel ("HSC"), Waha and Permian hubs, and intentionally submitting price and volume trade information for these artificial natural gas trades to trade publications, like *Platts Inside FERC's Gas Market Report ("Inside FERC"),* that play an integral part in determining the spot prices for natural gas in the United States, including the prices of natural gas futures and options contracts traded on the NYMEX. Defendants engaged in such conduct with the purpose and effect of driving down natural gas spot prices and manipulating the prices published by, *inter alia, Inside FERC,* in order to benefit Defendants' natural gas physical and financial trading positions, including natural gas basis swaps, held on electronic energy exchanges, such as the Intercontinental Exchange ("ICE"), which were tied to the price indexes at HSC, Waha and Permian hubs published by, *inter alia, Inside FERC.* By reason of Defendants' unlawful manipulation, the prices of NYMEX natural gas futures and options contracts were manipulated to artificial levels during the Class Period in violation of the CEA.

3.    On July 26, 2007, the U.S. Commodity Futures Trading Commission ("CFTC") filed a complaint for injunctive and other equitable relief, and civil monetary penalties against the Defendants for attempted manipulation of natural gas prices during the Class Period in violation of the CEA.[1]

4.    Also on July 26, 2007, the Federal Energy Regulatory Commission ("FERC") issued an Order to Show and Notice of Proposed Penalties (the "Order to Show Cause") against the Defendants for alleged manipulation of NYMEX natural gas futures prices during the Class Period. In the Order to Show Cause, the FERC seeks civil penalties, and disgorgement of

---

[1]    A copy of the CFTC's complaint is available on the CFTC's website, http://www.cftc.gov/stellent/groups/public/@lrenforcementactions/documents/legalpleading/enfetpcomplaint072607.pdf.

2

unlawfully gained profits, of nearly $152,000,000 against Defendants for manipulation of natural gas prices.[2]

5.     As a direct, proximate and foreseeable result of Defendants' unlawful conduct, the prices of NYMEX natural gas futures and options contracts were manipulated to artificial levels during the Class Period in violation of the CEA and Plaintiff and members of the Class have suffered damages therefrom.

## JURISDICTION AND VENUE

6.     Natural gas is a "commodity" and is the "commodity underlying" natural gas futures and options contracts traded on the NYMEX, as those terms are defined and used in Section 1a(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

7.     This Court has jurisdiction over this action pursuant to Section 22 of the CEA, 7 U.S.C. § 25, 28 U.S.C. §§ 1331 and 1337.

8.     Venue is proper in the Southern District of New York, pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d). Defendants transacted business in the Southern District of New York, the claims arose in the Southern District of New York, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in the Southern District of New York. Defendants' unlawful acts manipulated the prices of NYMEX natural gas futures and options contracts which were traded in this district in which NYMEX is located, at One North End Avenue, New York, New York.

9.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

---

[2]    A copy of the FERC's Order to Show Cause is available on the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf.

## PARTIES

10.      Plaintiff traded NYMEX natural gas futures contracts during the Class Period. Plaintiff was damaged by Defendants' manipulation of the prices of NYMEX natural gas futures contracts to artificial levels.

11.      Defendant Energy Transfer Partners, L.P. ("ETP"), a Delaware limited liability partnership, is a multi-billion dollar publicly traded energy company with its principal place of business in Dallas, Texas. ETP's business includes the gathering, compression, processing, transportation and storage of natural gas. By equity market capitalization, ETP is one of the largest publicly-traded limited partnerships in the United States. For the fiscal year ending August 31, 2006, as reflected in its public filings, ETP had revenues of approximately $7,900,000,000, of which approximately 87 percent were from its natural gas operations (with the remainder from retail propane distribution). ETP has a current market capitalization of roughly $8.6 billion. ETP owns approximately 12,000 miles of natural gas pipeline systems that link supply areas in West Texas, such as Waha, with East and South Texas market centers such as Katy, HSC, and Carthage including: (1) the Houston Pipeline Company ("HPL"), an intrastate pipeline system, which serves the HSC market, and the associated Bammel Gas Storage Facility, one of the largest underground reservoir storage fields in North America with a total working gas capacity of 65 Bcf; (2) Oasis Pipeline, an intrastate natural gas pipeline that runs from the Waha Hub in West Texas to the Katy Hub in South Texas; and (3) the Energy Transfer Fuel, LP ("ET Fuel") system, an intrastate pipeline system that extends from the Waha Hub in West Texas and traverses North, Central and East Texas. ETP's employees buy, sell, or direct its subsidiaries' employees to buy and sell physical and financial natural gas contracts for profit. At all times relevant hereto, ETP had *de jure* and *de facto* control over its subsidiaries named below, each of which acted under the direction, and at the behest of, Defendant ETP.

4

12.     Defendant Energy Transfer Company (a/k/a La Grange Acquisition, L.P.) ("ETC"), a Texas limited partnership, is a subsidiary of ETP with business offices located in San Antonio and Houston, Texas. ETC engages in natural gas midstream operations (*i.e.*, the portion of the natural gas business between the production of the natural gas from wells and the delivery of natural gas to retail, commercial and industrial customers) and intrastate natural gas transportation and storage operations for ETP. ETC's employees buy and sell physical and financial natural gas contracts for ETP and ETC for profit, including under the name "ETC Marketing, Ltd."

13.     Defendant Houston Pipeline Company ("HPLC"), a Texas corporation, is a subsidiary of ETP with business offices in Houston, Texas. HPLC serves the HSC natural gas market, the city of Houston, other natural gas delivery locations or "hubs," and owns the Bammel Gas Storage Facility ("Bammel"), which is located near Houston. HPLC's employees also buy and sell physical and financial natural gas contracts for ETP and ETC for profit, including under the name "ETC Marketing, Ltd."

14.     Defendant ETC Marketing, Ltd. ("ETC Marketing"), a Texas limited partnership, is a subsidiary of ETP with business offices located in San Antonio, Texas. ETC Marketing's employees buy and sell physical and financial natural gas contracts for ETP, ETC and HPLC for profit, both on and off exchange, including on ICE. ETP and ETC traded on ICE under the name ETC Marketing.

15.     Roughly fifteen percent of all gas produced in the United States flows through Defendants' natural gas gathering and transportation pipelines, three natural gas processing plants, fourteen natural gas treating facilities and three natural gas storage facilities, including the Bammel natural gas storage facility.

5

16.     The acts alleged in this Complaint to have been committed by Defendants were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management of each of the Defendants' affairs.

## SUBSTANTIVE ALLEGATIONS

**I.     Background**

   **A.     Overview of Natural Gas Futures Contracts Traded on the NYMEX**

17.     NYMEX has been designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.  NYMEX submits to the CFTC various rules and regulations for approval through which the NYMEX designs, creates the terms of, and conducts trading in various commodity futures and options, including futures and option contracts for natural gas. The NYMEX is an organized, centralized market that provides a forum for trading natural gas futures contracts.  The NYMEX provides natural gas futures contracts with delivery dates extending 72 sequential months into the future, commencing with the next calendar month. A futures contract is an agreement to buy or sell natural gas at a date in the future. The NYMEX specifies the terms of trading, including the trading units (10,000 Million British Thermal Units ("MMBtus")), price quotation, trading hours, trading months, minimum and maximum price fluctuations, point of delivery, grade and quality specifications, margin requirements, etc.

18.     NYMEX uses the "Henry Hub" as the point of delivery for natural gas pursuant to its standardized futures contracts.  The Henry Hub is the largest centralized point for natural gas spot trading in the United States and is physically situated at Sabine's Henry Gas Processing Plant in Louisiana.  Henry Hub is a very large and liquid spot market for natural gas delivery in North America.

19.     Henry Hub is an example of a "Market Hub," operating as a physical transfer point (commonly known as "headers"), where numerous pipelines are connected to a facility that

allows for the redirection of gas volumes from one pipeline to another.  Market Hubs offer services that facilitate the buying, selling and transportation of the actual natural gas within the local facility including, but not limited to, making arrangements for storage and plant processing services, transfer of title for natural gas sales and purchases, and transportation of the natural gas.

20.     The Henry Hub links nine interstate and four intrastate pipelines, including Acadian, Columbia Gulf, Dow, Equitable (Jefferson Island), Koch Gateway, LRC, Natural Gas Pipe Line, Sea Robin, Southern Natural, Texas Gas, Transco, Trunkline and Sabine's mainline.

21.     Trades on the NYMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to pay for the commodity and take delivery (or engage in an alternative settlement method) and the "short" side that represents the seller of a contract who has equivalent but reverse obligation.  If a market participant holds its positions to the end of the settlement period for the prompt-month contract, the market participant is obligated to "go to delivery."  That is to say, the "futures" contract for the prompt month becomes a present contractual obligation for the purchase and sale of the physical natural gas.  Longs must take delivery and shorts must make delivery of 10,000 MMBtus per contract over the course of the contract month, at the buyer's interconnection on the Sabine Pipe Line Co.'s Henry Hub in Louisiana.[3]  The price for the natural gas that goes to delivery is the "settlement price" of the NYMEX natural gas futures contract.[4]

22.     The "settlement price" of a NYMEX natural gas futures contract is the volume-weighted average price of trades made during the 30-minute "settlement period," which is the last 30 minutes of trading on the termination day for the "prompt-month" contract.  The

---

[3]   *See* NYMEX Exchange Rulebook §§ 220.10-12, available at http://www.nymex.com/rule_main.aspx?pg=33.

[4]   *See* NYMEX Exchange Rulebook § 220.11(D), available at http://www.nymex.com/rule_main.aspx?pg=33.

"prompt-month" is the next calendar month. The "termination day" for NYMEX natural gas futures contracts is the third-to-last business day of the month preceding the prompt month, and the settlement period occurs from 2:00 p.m. to 2:30 p.m. on the termination day (except when the NYMEX is operating on a holiday schedule). So, for example, for August 2007, the prompt-month contract was the September 2007 NYMEX natural gas futures contract. The last business day for August 2007 was Friday, August 31, so the settlement period for the September 2007 NYMEX natural gas futures contract took place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.

23.     Only a small percentage of all futures contracts traded each year result in delivery of the underlying commodities. Instead, traders generally offset their futures positions before their contracts mature. For example, a purchaser of a futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of natural gas by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**B.     The Natural Gas Market and the HSC Natural Gas Delivery Hub**

24.     During the Class Period, natural gas was a commodity that was typically transported in interstate commerce through a network of pipelines across the United States.

25.     Much of the natural gas consumed in the United States is produced in the Gulf Coast region, primarily in Texas and Louisiana, and shipped by pipeline to the biggest consumer markets in the Midwest and Northeastern states.

26.     Texas is one of the largest gas consuming states, with natural gas flowing from the southern onshore production areas to the northern part of the state through pipelines concentrated on the Texas east coast, and from the west Texas production areas to the consuming areas near Houston, Dallas and San Antonio.

8

27.     The HSC natural gas delivery location or "hub," located near Houston, Texas, is one of the principal gateways for natural gas destined for markets in Texas, serving a highly concentrated area of large-volume consumers within Texas, including chemical plants, refineries, and power generating stations.

28.     HSC is also an important byway for natural gas continuing north to interstate pipelines delivering gas to the Midwest and Northeastern states.

C.     **Physical Natural Gas Trades and the Natural Gas Price Indexes**

29.     During the Class Period, at the direction of ETP, natural gas traders at ETC, HPLC and ETC Marketing bought and sold natural gas for profit.  To that end, their traders entered into transactions calling for the actual physical delivery of natural gas ("physical trades") to certain natural gas delivery hubs, including at HSC, Waha, and Permian.

30.     Physical trades were typically priced with either a "fixed-price" set at the time of the transaction, or with reference to an index price to be set at a later date.  The physical trades at issue here are "fixed-price" natural gas transactions.

31.     During the Class Period, natural gas traders and energy companies, including the Defendants, reported price and volume information ("trade data") regarding their fixed-price physical trades for specific natural gas delivery hubs, like HSC, to companies that calculated and published natural gas price indexes ("indexes"), including Platts' *Inside FERC*.

32.     During the Class Period, Platts collected from market participants, including Defendants, trade data relating to fixed-price, "baseload" transactions that were negotiated during "bidweek" for specific natural gas delivery hubs, including HSC.

33.     A "baseload" transaction refers to a natural gas trade that requires the seller to deliver physical natural gas to the buyer at a particular natural gas delivery hub (like HSC),

9

ratably, over the course of the following month (the "prompt month"). "Bidweek" typically refers to the last five business days of the month before the prompt-month begins.

34.    During the Class Period, Platts also published trade data collected from natural gas market participants, including Defendants, about fixed-price day-ahead or daily transactions providing for physical delivery of a specific quantity of natural gas, for a specified price, at a specific location, like HSC, on the day immediately following the trade date, in *Platts Gas Daily* ("*Gas Daily*").

35.    During the Class Period, Defendants' employees knew that Platts used trade data collected from natural gas market participants, including Defendants, about fixed-price, baseload contracts negotiated during bidweek, to calculate and publish its *Inside FERC* monthly price indexes for specific natural gas delivery hubs, including HSC. The *Inside FERC* monthly price indexes were published by Platts at the beginning of each month following the bidweek during which trade data was collected.

36.    During the Class Period, natural gas market participants widely used price indexes, including *Inside FERC* and *Gas Daily*, for various purposes, including the pricing of both physical and financial natural gas contracts. Moreover, natural gas market participants, including NYMEX natural gas traders, referred to the price indexes for price discovery, for assessing price risks, and determining the price at which they will buy or sell NYMEX natural gas futures. Natural gas spot prices strongly impact NYMEX natural gas futures prices. For instance, an increase in prices at a natural gas trading hub signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the supply/demand balance when conducting their futures trading. According to the CFTC, Platts

indexes "have a financial impact upon billions of dollars worth of natural gas transactions."[5]

### D.    Financial Basis Swaps

37.    For a storable commodity, such as natural gas, there is a clear relationship between spot and futures contract prices.

38.    There is also a clear relationship between NYMEX natural gas futures contract prices and the market prices that prevail for a wide range of natural gas derivatives, including financially-settled natural gas futures "swaps"[6] and "basis swaps."[7]  Certain options also settle on the settlement price of a NYMEX natural gas futures contract.[8]

39.    During the Class Period, natural gas market participants, including the Defendants, traded via "financial basis swaps," trades reflecting the price difference (or "differential") between the index for certain physical natural gas trading locations, such as HSC, and the price of natural gas futures contract traded on the NYMEX.

---

[5]    *U.S. Commodity Futures Trading Commission v. The McGraw-Hill Companies*, Inc., No. MC-03-187 (S.D. Tex.  filed May. 19, 2003) at 5.

[6]    A natural gas futures swap ("swap") is a purely financial instrument that operates much like the NYMEX natural gas futures contract except that, rather than becoming a physical delivery or purchase obligation, it settles financially at the termination of the NYMEX natural gas futures contract's final settlement price. Financial swaps do not entail physical delivery risk. The buyer in a swap transaction for a given contract month agrees to pay the seller a "fixed price," *i.e.*, a specific amount determined at the time when the transaction occurs. The seller pays the buyer a "floating price," which will be the actual final settlement price for the NYMEX natural gas futures contract and which is not known at the time of the swap transaction. Thus, buyers and sellers hope to profit based on the relation between the price paid at the time of the transaction and the ultimate settlement price of the NYMEX natural gas futures contract; the buyer of the swap profits if the floating price (*i.e.*, the actual final NYMEX natural gas futures contract settlement price) is higher than the fixed price at which the swap is trading at the time that the transaction takes place; the seller profits if the floating price is lower than the fixed price.

[7]    A "basis swap" is a derivative instrument whose value is based on the difference between the settlement price of the NYMEX natural gas futures contract for a given contract month and that of the monthly "index" at a specified location for that same month.

[8]    While options on prompt-month futures and other derivatives expire on the day before termination day, trading during the settlement period on termination day continues to affect the value of options on future-month instruments. Trading during the last two minutes on the termination day is particularly important, as options continue to trade at prices in relation to the price of the expiring NYMEX natural gas futures contract. Options and other derivatives are given a non-final settlement price based on trading during these two minutes, which determines the options' marked-to-market value for that day.

40.    Normally, natural gas market participants execute these financial basis swaps to hedge price risk, often in conjunction with NYMEX futures contracts, to speculate on the difference between the price of natural gas at the named location and the price of natural gas at Henry Hub, or both.

41.    The financial basis swap at issue here is the HSC financial basis swap. The buyer and seller of an HSC financial basis swap exchange payment streams, with the buyer paying the seller the NYMEX final settlement price plus or minus a differential, and the seller paying the buyer the monthly HSC index price published by *Inside FERC*.

42.    By entering the HSC financial basis swap, the seller will obtain a financial benefit the lower the *Inside FERC* index price moves from the NYMEX natural gas settlement price, and thus the wider the difference between the two prices.

43.    During (and prior to) the Class Period, employees at ETC, ETC Marketing and HPLC (at the direction or with the consent of ETP) entered into financial basis swaps, including HSC financial basis swaps, with other natural gas market participants.

**E.    The Intercontinental Exchange**

44.    Natural gas market participants, including Defendants, enter into and execute physical trades and financial basis swaps on electronic trading platforms, such as ICE, as well as through direct negotiations with other market participants in the bilateral markets.

45.    ICE is an electronic trading platform that offers trading in physical natural gas contracts for over 100 natural gas hubs in North America, including the HSC. In addition to trading in physical natural gas, ICE offers trading in a number of financial natural gas contracts, including HSC financial basis swaps.

46.    The settlement prices for ICE natural gas swaps are pegged to the final settlement prices for the corresponding NYMEX natural gas futures contract. Therefore, the two

instruments are functionally equivalent for risk management purposes, and (with minor deviations) their prices essentially move in lockstep with one another. Traders base their trading decisions on whether to transact in ICE swaps or NYMEX futures contracts based on factors such as which market has greater liquidity at a given time. Many traders have positions in multiple contracts on both exchanges at the same time.

47.     The price curves for ICE swaps and NYMEX futures contracts indicate that the price risks from purchasing ICE swaps are identical to the price risks from purchasing NYMEX futures contracts. Since both contracts are exchange-cleared, there exists no greater counterparty credit risk from trading in one market versus the other. While there exists a substantial volume of arbitrage trading attempting to exploit minor, temporary price discrepancies between the NYMEX and the ICE markets, the two markets' prices essentially move in lockstep, and the two markets function as a single, integrated market.

48.     However, there exists one crucial difference between the trading in ICE swaps and NYMEX futures contracts—the degree of regulatory oversight. CFTC Designated Contract Markets like NYMEX are subject to a panoply of regulation, including regulations that require and authorize them to prevent manipulative trading. Pursuant to a provision of the Commodity Futures Modernization Act of 2000 ("CFMA") referred to as the "Enron loophole," unregulated markets such as ICE (unlike Direct Contract Markets like NYMEX) have no legal obligation to monitor trading, prevent manipulation or price distortion, or ensure that trading is fair and orderly. Additionally, under the CFMA's "Enron loophole," the CFTC has neither the authority nor the obligation to monitor trading on unregulated exchanges such as the ICE.

## II.    **Defendants' Manipulation**

### A.    **Overview**

49.    Defendants dominated sales of fixed-price natural gas at HSC, often comprising 80 percent or more of total sales. Defendants reported their fixed price sales at HSC to *Inside FERC* and thus were able to use their domination of the market to set the *Inside FERC* HSC index. In spite of Defendants' sales activity at HSC, they were consistently a net buyer of monthly gas priced at the *Inside FERC* HSC index, and thus were positioned to benefit from their manipulation which resulted in artificially lower natural gas spot prices at HSC.

50.    At the same time, Defendants had entered into natural gas basis swaps to leverage their benefit from suppressing monthly physical prices at HSC. During Defendants' manipulation of the market at HSC, Defendants sold HSC basis swaps in amounts more than three times as large as the volume of fixed price natural gas that Defendants sold at HSC. Accordingly, one third, on average, of the volume of HSC basis swaps that Defendants sold were necessary to lock in the differential between Waha and HSC, while the remainder of Defendants' short position was a "speculative" bet on the direction of the HSC basis, *i.e.*, difference between the Platts *Inside FERC* HSC index and the NYMEX contract settlement price. In actuality, Defendants' short financial position was neither a bet nor was it speculative because Defendants were able to, and did, manipulate and skew the Platts *Inside FERC* HSC index in favor of its financial position to the detriment of other market participants. Defendants' net short position enabled them to reap the unjust profits of any widening of the HSC basis, without any offsetting losses from their physical transactions.

51.    Defendants' strategy of taking physical and financial positions that benefited from artificially low prices at HSC, flooding the market with offers to suppress price, and then reaping the rewards of its manipulation was particularly successful in September 2005 (for gas delivered

in October 2005), but Defendants engaged in this manipulative conduct on at least 8 additional occasions during the Class Period, including, *inter alia*, December 29, 2003 (for gas delivered in January 2004); September 24, 2004 and September 27, 2004 (for gas delivered in October 2004); November 23, 2004 and November 24, 2004 (for gas delivered in December 2004); December 28, 2004 (for gas delivered in January 2005); January 27, 28, and 31 (for gas delivered in February 2005); June 28, 2005 (for gas delivered in July 2005); August 29, 2005 (for gas delivered in September 2005); and November 28, 2005 (for gas delivered in December 2005). Based on their unlawful and manipulative behavior, Defendants realized unjust profits of almost $70,000,000 in their natural gas trading.

### B.    Defendants Had the Power To Suppress Prices at HSC

52.    During the Class Period, ETP had a dominant position in the market at HSC.  ETP owned three of the major pipelines in the HSC/Katy market area (HPL, Oasis Pipeline, ET Fuel) and the major storage facility (Bammel) in the area.  During the Class Period, ETP had captive producers who shipped on its multiple gathering systems in South and East Texas, and was responsible for bringing local natural gas production to the HSC/Katy market area on HPL and from West Texas/Waha production areas through Oasis, and from North Texas on ET Fuel.

53.    ETP knew that by virtue of its position as the dominant seller, which was enabled by its control of substantial physical assets and contracts with captive producers, it could move prices at HSC and nearby natural gas delivery points.

54.    ETP's officer in charge of trading at HSC during the Class Period, Marshall ("Mackie") McCrea, acknowledged in sworn testimony before the FERC, that ETP "move[d]

15

enough volume" to affect prices at HSC.[9]  Another ETP trader also testified that during the Class Period, ETP had the ability to exert significant influence on prices at nearby points such as Katy and that, by reversing the direction of flow on its Oasis Pipeline, ETP could reverse the basis differential between Waha and Katy.

### C.    ETP Intended to Manipulate the Price of Natural Gas at HSC

55.    ETP specifically intended to manipulate the price of prompt month fixed price natural gas at HSC during the Class Period. ETP intentionally sold natural gas at artificially low, non-competitive prices which were below levels suggested by objective reference points, such as HSC-Henry Hub basis at the time ETP began its offers and trades and prices at nearby pricing points. ETP consistently positioned its trading book to benefit from the artificially lower monthly prices at HSC it created, and consistently profited from these artificially lower prices at HSC. ETP knew the actions it was taking would suppress fixed price natural gas at HSC and artificially impact the prices of NYMEX natural gas futures and options contracts traded during the Class Period. ETP engaged in such manipulative conduct with the specific intent to benefit its natural gas physical and financial trading positions.

56.    Senior management at ETP was aware of and directed ETP's manipulative strategy to suppress fixed price gas at HSC. On September 26, 2005, McCrea instructed at least one ETP trader that:

> [A]s long as we sell as much as we can sell, it ought to push ship down . . . . You know, it'd be nice to have Ship kind of spread back out from, uh, both for this month or October, and also for our summer/winter business.[10]

---

[9]    See p. 24, n.54 of the FERC Order to Show Cause, available at the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf

[10]    See pp. 21-22, n.46 of the FERC Order to Show Cause, available at the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf

Douglas Ray, an HPL trader on the telephone conversation, responded, "Exactly."[11]

57.     In this conversation, McCrea stated that if ETP sold as much as it could sell, it would reduce the natural gas price at HSC, *i.e.*, "push Ship down." By stating that "it'll be nice to have Ship kind of spread back from . . . October," McCrea explicitly stated that he wanted HSC prices to be lower for October. "[S]pread back out from" is a reference to the price at HSC widening from the NYMEX Contract price. McCrea's reference to "summer/winter business" indicates that ETP intended to purchase some of the gas at a suppressed price, inject it into storage and withdraw it during the winter. This indicates that McCrea intended ETP to trade in order to lower prices at HSC and thereby widen the HSC basis for October.  By trading to "push Ship down," ETP could execute its win-win, risk-free trading strategy to forego profits in its sales of fixed price gas at HSC on September 28, 2005, to unlawfully gain outsized profits on its other physical and financial positions.

58.     In addition, McCrea told Ray in the same conversation that "it probably makes a lot of sense to come out hard today for tomorrow" because of "where Hub's . . . trading sits, where HPL sits, where storage sits." Ray did indeed sell daily, fixed price gas at HSC on the Monday morning of September 26, 2005 for the next day at prices $2.50 less than market levels prior to the weekend.[12] This comment and the subsequent activity shows that McCrea knew that selling at HSC would benefit a range of ETP's positions and that his instructions were followed.

59.     ETP's trading desks in San Antonio, Houston, and Dallas coordinated their activities to assure that losses one desk took to help execute manipulations would be compensated by profits realized by another desk. In a conversation on September 26, 2005, prior

---

[11]  See pp. 21-22, n.47 of the FERC Order to Show Cause, available at the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf

[12]  See pp. 22, n.49 of the FERC Order to Show Cause, available at the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf

to ETP's manipulation of HSC on September 28, 2005, Ray speaks as follows to Small,[13] another

ETP trader:

> [L]et me toss something out I know Mackie's [McCrea] gonna probably want to get involved in this, but as far as how we're going to split this up ... just say split it in thirds. You take a third, he'll take a third, and we'll take a third, how does that sound to you?[[14]]

60.     This conversation concerned the appropriate way to split profit and loss between

the Houston and San Antonio trading desks regardless of how successful each desk was

individually.  There was a pattern of coordination and profit-sharing between the various trading

desks.  Traders at ETP's various business units (*i.e.*, traders for HPL, ET Fuel, Oasis Pipeline,

ETC Marketing) acted in concert and considered the benefit to the ETP corporate family as a

whole, rather than the benefit to their individual trading books considered in isolation.  Thus,

most or all the ETP traders would have been aware of ETP's net positions.[15]

61.     By reason of ETP's manipulative conduct, the prices of NYMEX natural gas

futures and options contracts were manipulated to artificial levels during the Class Period.

**D.      Defendants Manipulated the Price of Fixed Price
         Natural Gas at HSC During the Class Period**

62.     Beginning as early as December 2003, ETP suppressed monthly prices at HSC to

influence the *Inside FERC* HSC published index to benefit its financial and physical natural gas

positions held throughout the Class Period.  Defendants' manipulations were significant in terms

---

[13]  Ray was responsible for the Houston/Dallas trading desk, which managed the operations of ET Fuel and HPL. Small was responsible for the San Antonio desk, and was responsible for the Oasis Pipeline, the vast majority of purchases at Waha and sales at HSC, as well as financial products for both speculation and hedging, including NYMEX Contracts and basis swaps.

[14]  See pp. 23, n.51 of the FERC Order to Show Cause, available at the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf

[15]  See pp. 23-24, nn.50-53 of the FERC Order to Show Cause, available at the FERC's website, http://www.ferc.gov/EventCalendar/Files/20070726084254-IN06-3-002.pdf

of the dollars involved and impact on the natural gas market, including causing the prices of NYMEX natural gas options and futures contracts to trade at artificial levels.

63.    During the Class Period, ETP suppressed fixed price natural gas at HSC for prompt month delivery on at least the following occasions: December 29, 2003 (for gas delivery in January 2004); September 24, 2004 and September 27, 2004 (for gas delivered in October 2004); November 23, 2004 and November 24, 2004 (for gas delivered in December 2004); December 28, 2004 (for gas delivered in January 2004); January 27, 28, and 31, 2005 (for gas delivered in February 2005); June 28, 2005 (for gas delivered in July 2005); August 29, 2005 (for gas delivered in September 2005); September 28, 2005 (for gas delivered in October 2005); and November 28, 2005 (for gas delivered in December 2005).

64.    ETP manipulated fixed price natural gas at HSC by placing artificially low, non-competitive price offers and bids at HSC during bid week, frequently on the day the NYMEX natural gas futures contract expired. ETP often placed fixed price bids, even though it did not buy fixed price natural gas on ICE. Instead, ETP used its bids to artificially lower natural gas spot prices at HSC. Further, during the Class Period, ETP's trades were consistently concentrated during the last half hour of trading for the NYMEX natural gas futures contract. This enabled ETP to ensure that the *Inside FERC* HSC index would artificially settle lower relative to the settlement price of the NYMEX contract. As ETP was always short HSC basis swaps, it traded in order to artificially suppress prices. Typically for a market in which the NYMEX contract was increasing, ETP would cap prices at HSC such that the basis widened more from rising NYMEX contract prices than declining prices at HSC.

65.     ETP's manipulative trading varied slightly in October and December of 2004.  In those months, ETP sold earlier in bid week and then reentered the market offering HSC down in conjunction with falling NYMEX prices, thereby preserving the basis differential.

66.     During at least eight of the months during the Class Period, ETP lowered the HSC *Inside FERC* index price by an estimated $0.15 per month.  Fifteen cents represents a significant portion of the monthly HSC basis, the median value of which was $0.57 for the eight relevant months.  ETP's manipulation on September 28, 2005 for natural gas delivered in October 2005, lowered the HSC *Inside FERC* index by well over one dollar.  As a result thereof, during the Class Period, ETP realized unjust natural gas trading profits of nearly $70,000,000.

### 1.     September, 2005

67.     ETP's September 28, 2005 manipulation of October 2005 natural gas at HSC was the largest of ETP's manipulations of monthly gas at HSC.

68.     By September 22, 2005, ETC's traders had purchased at the Waha natural gas delivery hub, which is located in West Texas, approximately 3,357,000 MMbtus of natural gas (*i.e.*, had acquired a "long" physical Waha natural gas position), intending to sell the vast majority of that natural gas at HSC, at prices higher than ETC had purchased it at Waha, by transporting it on pipelines from Waha to HSC as October 2005 baseload natural gas.

69.     By September 23, 2005, ETC and HPLC traders had built a net short financial basis swap position (approximately 15,882,653 MMbtus) in the October 2005 HSC financial basis swap.  The financial basis swap ultimately would be settled based upon the difference between the October *Inside FERC* HSC monthly index price (published the first of the month in October) and the HH NYMEX settlement price (published at the close of trading in that contract on September 28, 2005).

20

70.    On September 24, 2005, Hurricane Rita made landfall, impacting the Texas and Louisiana Gulf Coast region by, among other things, reducing the demand for natural gas in the Houston consuming area as area residents evacuated due to the storm.

71.    Beginning on Monday, September 26, 2005 (the first day of the September 2005 bidweek for October baseload natural gas), Defendants' employees, working in combination and concert with each other, devised a scheme to benefit their HSC financial basis swap positions by depressing the price of physical natural gas at HSC by: (i) intentionally buying on September 26 and 27, 2005 additional quantities of physical natural gas at Waha for transport to HSC during the month of October; (ii) intentionally increasing the short HSC financial basis swap position; (iii) intentionally dumping (selling) on September 28, 2005 a massive quantity of fixed-price, baseload natural gas; and (iv) then intentionally reporting trade data reflecting those fixed-price, baseload sales to *Inside FERC* for its use in calculating the October *Inside FERC* monthly price index at HSC.  Defendants' employees devised and executed this scheme in order to benefit Defendants' financial basis swap contracts tied to the October 2005 *Inside FERC* monthly price index at HSC.

72.    Defendants' employees' intent to manipulate the price of natural gas at HSC is reflected, in part, in a recorded telephone conversation on September 26, 2005 between an ETP Senior Vice President and an employee of HPLC.  In that conversation, the ETP Senior Vice President instructed at least one of his traders to "come out hard today for tomorrow" and "as much market as y'all can capture, capture it" and "even if you oversell [HSC], we'll figure it out later."  In the same conversation, the ETP Senior Vice President said, "as long as we sell as much as we can, it ought to push [Houston] ship [Channel] down."  He continued, "You know, it

21

would be nice to have [Houston] Ship [Channel] kinda spread back out from from from uh ..,
both for this month or October, also for our for our summer winter business."[16]

73.     Consistent with that instruction, on September 26 and 27, 2005, ETC traders (who
were also agents of ETC Marketing) bought up additional natural gas at Waha for transport to
HSC in October. When combined with the natural gas purchases at Waha for October HSC
baseload delivery made before September 23rd, Defendants' total long physical Waha position
increased to 8,707,776 MMbtus, or 8.7 Bcf (billion cubic feet) of natural gas, nearly triple its
earlier long Waha position, despite the decreased demand at the HSC hub due to area residents
having evacuated the Houston area in the wake of Hurricane Rita.

74.     On September 28, 2005, beginning at approximately 2:00 p.m., an ETC trader,
under the name "ETC Marketing," at the direction of the ETP Senior Vice President, dumped
(sold) on ICE and in the bilateral market (*i.e.*, executed through direct negotiations with other
market participants) approximately 11.2 Bcf of natural gas for baseload delivery in October 2005
at HSC to exert downward pressure on the prices at HSC. Nearly 9 Bcf of these sales were
executed on ICE. The ETC trader who executed the baseload natural gas contracts on ICE was
an agent of ETC Marketing.

75.     Thirty-four of the thirty-five fixed-price trades executed on September 28, 2005
on ICE in the HSC baseload contract were executed by an ETC trader at the direction of the ETP
Senior Vice President and under the name ETC Marketing, comprising 96.65% of all HSC
October baseload sales volume on ICE that day.

76.     Simultaneous with the conduct outlined in paragraph 73 and before the conduct
described in paragraph 74 above, by approximately 1:00 p.m. EDT (Eastern Daylight Time) on

---

[16] See CFTC Complaint, p. 10 at ¶37, at http://www.cftc.gov/stellent/groups/public/@
lrenforcementactions/documents/legalpleading/enfetpcomplaint072607.pdf

September 28, 2005, ETC and HPLC traders had increased their short HSC financial basis swap

position by 7,952,500 MMbtus, for a total short HSC financial basis swap position of 23,835,153

MMbtus of natural gas—or approximately 23.8 Bcf of natural gas.  The financial basis swap

ultimately would be settled based upon the difference between the October *Inside FERC* monthly

price index at HSC (published the first of the month in October) and the HH NYMEX settlement

price (published at the close of trading in that contract on September 28, 2005).

77.     Thereafter, ETC employees prepared a spreadsheet containing trade data

reflecting Defendants' fixed-price, baseload natural gas contracts for delivery at HSC that were

executed on September 28, 2005.

78.     ETC employees then submitted that spreadsheet to Platts for use by Platts in

calculating the October *Inside FERC* monthly price index at HSC, and knowing that Platts would

likely use this trade data in calculating the October *Inside FERC* monthly price index at HSC.

79.     On October 1, 2005, *Inside FERC* published the HSC monthly price index.  The

index price was based upon the trade data Platts had obtained from natural gas market

participants about their fixed-price, October baseload deals negotiated during the September

2005 bidweek.

### 2.     November, 2005

80.     Beginning on or about November 21, 2005 (the first day of the November 2005

bidweek for December baseload natural gas), Defendants' employees, working in combination

with each other, devised a scheme to repeat the trading strategy they had employed during the

September 2005 bidweek, for essentially the same purpose.  Namely, Defendants' employees

benefited their HSC financial basis swap positions tied to the December *Inside FERC* monthly

price index at HSC by: (i) intentionally buying on November 21, 22, and 28, 2005 large

quantities of natural gas at the Waha hub for transport to HSC during the month of December;

23

(ii) intentionally dumping (selling) on November 28 a massive quantity of fixed-price, baseload natural gas on the HSC market; (iii) intentionally increasing the HSC short financial basis swap position; and (iv) then intentionally reporting trade data reflecting those fixed-price, baseload sales to *Inside FERC* for its use in calculating the December *Inside FERC* monthly price index at HSC.

81.     Prior to November 21, 2005, ETC held a net short position of 992,031 MMbtus of physical natural gas at Waha for December 2005 baseload delivery.  Consistent with Defendants' employees intent to acquire a large amount of natural gas to sell at HSC for December 2005 baseload delivery, on November 21, 22, and 28, 2005, ETC traders purchased 4,771,954 MMbtus of natural gas at Waha for transport to HSC in December.  Accordingly, Defendants' total net long physical Waha position increased to 3,779,923 MMbtus, or about 3.8 Bcf of natural gas.

82.     On November 28, 2005, an ETC trader, under the name "ETC Marketing," dumped (sold) on ICE approximately 9 Bcf of natural gas for baseload delivery in December 2005 at HSC in order to exert downward pressure on the prices at HSC.  The ETC trader who executed the baseload natural gas contracts on ICE was an agent of ETC Marketing.

83.     Thirty-one of the thirty-four trades executed on November 28, 2005 on ICE in the HSC baseload contract were executed by ETC traders (under the name ETC Marketing), comprising 95.7 % of all HSC December baseload sales volume on ICE that day.

84.     Simultaneously, Defendants built an even larger financial short position in the HSC December 2005 basis swap contract than they had in September 2005.  During the conduct outlined in paragraphs 81 and 82 above, *i.e.*, from November 21 to November 28, 2005, ETC and HPLC traders increased their short HSC financial basis swap position by 13,480,009 MMbtus,

for a total short HSC financial basis swap position of 45,181,360 MMbtus of natural gas—or approximately 45.2 Bcf of natural gas. The financial basis swap ultimately would be settled based upon the difference between the December *Inside FERC* monthly price index at HSC (published the first of the month in December) and the HH NYMEX settlement price (published at the close of trading in that contract on November 28, 2005).

85.    Thereafter, ETC employees prepared a spreadsheet containing trade data reflecting Defendants fixed-price, baseload natural gas contracts for delivery at HSC that were executed on November 28, 2005.

86.    ETC employees then submitted that spreadsheet to Platts for use by Platts in calculating the December *Inside FERC* monthly price index at HSC, knowing that Platts would likely use this trade data in calculating the December *Inside FERC* monthly price index at HSC.

87.    On December 1, 2005, *Inside FERC* published the HSC monthly price index. That index price was based upon the trade data Platts had obtained from natural gas market participants about their fixed-price, December baseload deals negotiated during the November 2005 bidweek.

### 3.    **Seven Additional Months**

88.    During the Class Period, ETP suppressed fixed price natural gas at HSC for prompt month delivery on at least seven additional occasions: During the Class Period, ETP suppressed fixed price natural gas at HSC for prompt month delivery on at least the following occasions: December 29, 2003 (for gas delivery in January 2004); September 24, 2004 and September 27, 2004 (for gas delivered in October 2004); November 23, 2004 and November 24, 2004 (for gas delivered in December 2004); December 28, 2004 (for gas delivered in January 2004); January 27, 28, and 31, 2005 (for gas delivered in February 2005); June 28, 2005 (for gas delivered in July 2005); and August 29, 2005 (for gas delivered in September 2005).

89.     ETP manipulated fixed price natural gas at HSC in the additional seven relevant months using the same strategy that it employed on September 28, 2005. ETP would generally establish or frame a lower price by placing low price offers and often bids at HSC during bid week, frequently on the day the NYMEX Contract expired. ETP often placed fixed-price bids, even though it did not buy fixed price gas on ICE. Instead, ETP used bids to establish or frame lower prices. A seller seeking to suppress price posts lower bids to induce traders to believe that the suppressed transaction prices are competitive, at least relative to outstanding bids.

90.     Further, during most of the seven months, ETP's trades were concentrated during the last half hour of trading for the NYMEX Contract. This enabled ETP to ensure that the IFERC HSC index would settle lower relative to the settlement price of the NYMEX Contract. As ETP was always short HSC basis swaps, it traded to suppress prices. Typically for a market in which the NYMEX Contract was increasing, ETP would cap prices at HSC such that the basis widened more from rising NYMEX Contract prices than declining prices at HSC.

91.     ETP's manipulative trading varied slightly in October and December of 2004. In those months, ETP sold earlier in bid week and then reentered the market offering HSC down in conjunction with falling NYMEX prices, thereby preserving the basis differential. Bidding activity shows that at least a portion of the HSC market became accustomed to ETP's strategy because bids were placed at low levels in anticipation of the ETP's well offered gas, i.e., gas offered at a relatively low price.

### E.    ETP Manipulated Daily Prices at the Waha and Permian Hub

92.     ETP manipulated the price of fixed price natural gas at Waha for next day (or daily) delivery of natural gas. Specifically, ETP sold fixed price daily natural gas at Waha on December 23, 2005 and December 28, 2005, and bought back similar volumes of daily natural gas at the Platts *Gas Daily* index on the same days. ETP had no legitimate business purpose to

26

execute these transactions. However, by selling fixed price daily natural gas on the noted dates, ETP intentionally and artificially suppressed the price of that gas, thereby increasing the value of its short financial index swap positions.

93.     By reason of ETP's manipulative conduct at Waha and the Permian Hub, the prices of NYMEX natural gas futures and options contracts were manipulated to artificial levels.

## MOTIVE AND INTENT

94.     Defendants had a very strong financial motive and incentive to manipulate natural gas prices.

(a)     First, Defendants are a major participant in the natural gas market and dominated trading at, *inter alia*, the HSC natural gas hub.

(b)     Also, Defendants not only conducted substantial trading in the physical market, but also held large trading positions in the OTC natural gas financial markets which benefited from their manipulation of natural gas spot prices.

(c)     Defendants profited handsomely from their manipulation of natural gas prices, recording unjust profits in their natural gas trading of nearly $70,000,000.

95.     Defendants therefore had the ability, as well as the motive and intention, to manipulate natural gas prices.

## EFFECTS

96.     As a result of the aforesaid unlawful acts,

(a)     the prices of NYMEX natural gas futures and options contracts during the Class Period have been manipulated to artificial levels, and

(b)     Plaintiff and other members of the Class have been damaged by these artificial prices.

27

97.    Determination of the specific amount of damages will require further discovery, including discovery that is in the sole possession of Defendants.

## CLASS ACTION ALLEGATIONS

98.    Plaintiff brings this action as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons, other than Defendants and their employees, affiliates, parents, or subsidiaries (whether or not named in this complaint), who purchased and/or sold NYMEX natural gas futures and options contracts between December 29, 2003 and December 31, 2005 (the "Class Period").

99.    The Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded NYMEX natural gas futures and options contracts during the Class Period.

100.    Common questions of law and fact exist as to all members of the Class and predominate over any questions that affect only individual members of the Class. These common questions of law and fact include, without limitation:

(a)    Whether the alleged manipulation of NYMEX natural gas futures contract prices based on Defendants' unlawful conduct violates the CEA;

(b)    Whether Defendants' conduct had an effect on the prices of NYMEX natural gas futures contracts and options purchased or sold by Plaintiff and the Class during the Class Period; and

(c)    The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

101.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class sustained damages arising out of Defendants' common course of

conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

102.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff is an adequate representative of the Class and has no interests which are adverse to the interests of absent Class members. Plaintiff has retained counsel who have substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation class action litigation.

103.    A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint. The cost to the court system of adjudication of such individualized litigation would be substantial. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

104.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### FRAUDULENT CONCEALMENT

105.    By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, engaged in secret and surreptitious

29

trading in order to manipulate and make artificial prices for natural gas futures and options on the NYMEX.

106.    Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until they became public in or around July 2007.

107.    Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure in or about July 26, 2007.

108.    Due to Defendants' fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS FOR MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. SECTION 1

109.    Plaintiff repeats and re-alleges the previous allegations as if fully set forth herein.

110.    Plaintiff and members of the Class purchased and sold one or more NYMEX natural gas futures and options contracts during the Class Period, and were injured as a result of Defendants' manipulation of the price of those contracts, and/or the price of the natural gas underlying those contracts, in violation of the CEA, 7 U.S.C. § 1, *et seq.*

111.    Defendants' activities alleged herein constitute manipulation of the price of NYMEX natural gas futures and options contracts, and/or the price of the natural gas underlying those contracts, during the Class Period in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

112.   Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)   For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representative and his counsel as Class counsel;

(B)   For a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

(C)   For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses;

(D)   For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury.

Dated: September 4, 2007
       New York, New York

Respectfully submitted,

Bernard Persky (BP-1072)
Gregory S. Asciolla (GA-2222)
LABATON SUCHAROW LLP
140 Park Avenue
New York, New York, 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Attorneys for Plaintiff*